# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## DOCKET NO. 5:11CV57-RLV

| | | |
|---|---|---|
| **KATHERYN R. JOHNSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Memorandum and Order** |
| | ) | |
| **THE STATE OF NORTH CAROLINA,** | ) | |
| | ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court upon Motion for Summary Judgment submitted on behalf of the Defendant State of North Carolina ("NC"), filed February 15, 2013, Plaintiff Katheryn Johnson's ("Johnson") response in opposition, Defendant's reply, and all related materials.  (Docs. 45, 49, 50).

## I.

Upon Defendant's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b), this Court dismissed claims brought by Plaintiff Johnson against NC alleging violation of the Fair Labor Standards Act, the Employment Income Security Act, the North Carolina Equal Employment Practices Act, the North Carolina Retaliatory Employment Discrimination Act, and the common law of North Carolina.  (Doc. 41).  All claims brought against former Defendant Superintendent Keith Whitener ("Whitener") were likewise dismissed.[1]  (Id.)

---

[1]  Keith Whitener, the "Administrator" or "Superintendent" at Alexander Correctional Institute, was the highest ranking official at the Alexander facility from 2009 through December 31, 2011. (Whitener Aff., ¶ 2 ).

The only remaining cause of action is against the State of North Carolina alleging violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5(e)-(f)(1).[2] The gist of Johnson's Title VII claim is that the State of North Carolina, acting through Plaintiff's employer, the North Carolina Department of Correction ("NCDOC")[3], then-Superintendent Whitener, Correctional Officer Shana M. Thompson ("Thompson"), and others, created a hostile work environment and then terminated Johnson as retaliation for her decision to lodge an internal complaint against a supervisor.[4]

Johnson was employed as a Correctional Officer for the North Carolina Department of Correction from October 2007 through February 3, 2011. Johnson was originally assigned to the Alexander Correctional Institution ("Alexander") in Alexander County, North Carolina. In or around October 2008, Johnson was assigned to work in Alexander's Transportation Unit ("Transportation"). (Whitener Aff., ¶ 3).

In September 2009, Johnson filed a sexual harassment complaint with NCDOC against Sergeant Lloyd Hames ("Sgt. Hames"), one of her supervisors at Alexander. As a result of a subsequent investigation undertaken by NCDOC's Office of Equal Employment Opportunity ("NCEEO") in response to Johnson's complaints, Sgt. Hames was reassigned to NCDOC's Foothills facility pending investigation. Sgt. Hames had no supervisory authority and no contact

---

[2] Defendant NC did not move for dismissal of this claim under Rule 12(b)(6).

[3] Effective January 1, 2012, the North Carolina Department of Public Safety assumed the operations of the NCDOC, which then ceased to exist. The State of North Carolina is responsible for the operations of both the former North Carolina Department of Correction and the North Carolina Department of Public Safety.

[4] The full spectrum of the parties' allegations are adequately summarized within the Court's Memorandum and Order dated October 17, 2012, which is hereby incorporated by reference. (Doc. 41).

with Plaintiff while Plaintiff's sexual harassment claims were being investigated. (Def.'s Exh. 1 at 44–45; Sweet Aff., ¶ 16; Whitener Aff., ¶ 3).

Upon completion of the internal investigation, the NCEEO concluded that Sgt. Hames, in fact, violated NCDOC policy and was specifically found to have engaged in "unacceptable personal conduct." (Whitener Aff., ¶ 9; Def.'s Exh. 4A). The NCEEO substantiated Johnson's sexual harassment claim and found that Hames "made sexually inappropriate comments" to Johnson, a subordinate employee; and that Hames failed to report a sexually explicit text message sent to him by Plaintiff.[5] *Id.* In Defendant's Recommendation to Demote Letter, Whitener noted that management "has lost confidence in [Hames'] ability to work effectively as a Correctional Sergeant," a position where it is expected that the Sergeant can provide guidance and leadership to subordinate staff" and act professionally. *Id.* In March 2010, Hames was demoted.[6] *Id.*

According to Johnson, her sexual harassment complaint against Sgt. Hames triggered a course of retaliatory conduct by Defendant. However, during the course of Defendant's internal investigation of Johnson's allegations concerning Sgt. Hames, NCDOC also concluded that Johnson had engaged in "unacceptable personal conduct." (Def.'s Exh. 2D). In addition to discovering that Plaintiff sent Sgt. Hames a sexually explicit picture, other correctional officers reported that Plaintiff Johnson had been using her cell phone to send text messages while driving

---

[5] Reportedly, on August 24, 2009, Plaintiff texted Sgt. Hames a picture of her pierced private parts. (Whitener Aff., ¶ 9). On September 2, 2009, Sgt. Hames sent a picture of himself from the waist up to Plaintiff. *Id.*

[6] After the administrative appeal process, Hames was eventually reinstated on December 1, 2010 to the rank of Sergeant but only continued his employment with NC for approximately three weeks after reinstatement. (Def.'s Exh. 1; Sweet Aff., ¶ 19).

NCDOC vehicles offsite.[7]  (Whitener Aff., ¶ 10).  In light of safety concerns and the severity of the allegations, Superintendent Whitener moved Plaintiff out of Transportation and into the Housing Unit ("Red Unit").  (Whitener Aff., ¶¶ 10,11).

On December 8, 2009, Johnson was disciplined for abandoning her post on October 12, 2009. (Def.'s Exh. 2C).  A written warning was issued by Assistant Superintendent Carlos Hernandez ("Hernandez") and made a part of Johnson's personnel record. *Id.*  Johnson claimed she obtained permission to leave work from Lieutenant James Gribble ("Gribble"), who Johnson admits was neither her immediate supervisor or the designated officer in charge.  *Id.*  Johnson stated that Gribble represented to her that he would inform the necessary personnel and that she was free to go. *Id.* Lieutenant Gribble reported that he instructed Johnson to call Lieutenant Blackburn, her direct supervisor.  *Id.*  Regardless, Johnson admitted that Gribble was not the officer in charge.  The abandoning post offense was characterized by NCDOC as "Grossly Inefficient Job Performance" due to the risks associated with leaving a post unattended. *Id.*  Johnson was advised that "if this problem reoccurs, or if other job performance or personal conduct incidents occur, you [Johnson] will be subject to additional discipline, up to and including dismissal." *Id.*

On or about December 29, 2009, Johnson filed a formal charge with the Equal Employment Opportunity Comission (EEOC file number 435-2010-00191) ("First EEOC Charge"), alleging (a) sexual harassment by Sgt. Hames; (b) creation of a hostile work environment following Johnson's sexual harassment complaint; (c) retaliation for filing a

---

[7]  In her role as a Correctional Officer in Transportation, one of Johnson's duties was transporting inmates with the help of other correctional officers to various offsite locations for appointments, etc. (Whitener Aff., ¶ 10; Sweet Aff., ¶ 3).

complaint; and (d) unwarranted demotion "on or about October 15, 2009."[8] (Def.'s Exh. 8). Plaintiff's First EEOC Charge alleged discrimination and / or harrassment based upon her sex and various forms of retaliation against her for reporting the harassment to her employer. *Id*. The First EEOC Charge asserted that the conduct amounted to "continuing action." *Id*. Before the EEOC rendered a decision on the merits of Johnson's charge, Johnson requested and obtained a right-to-sue letter from the EEOC on October 18, 2010. *Id*.

On January 15, 2010, Hernandez issued a second written warning based upon Johnson's unauthorized use of her cell phone in violation of NCDOC policy, including the occasion whereby Johnson admittedly sent a sexually explicit photo to Sgt. Hames. (Def.'s Exh. 2D). Assistant Superintendent Hernandez stated that his investigative findings concerning Johnson's cell phone usage were supported by the statements of five other correctional officers who reported a pattern of texting while driving a state vehicle or personal on-the-job texting while in an outside facility. *Id*. Hernandez explained that the evidence uncovered during his investigation led him to question Johnson's credibility. *Id*. In addition, Hernandez expressed concern that during the pendency of the internal investigation, Johnson had discussed the matter with uninvolved staff members. *Id*. According to Hernandez, this also constituted misconduct. *Id*.

In February 2010, Johnson was permitted to move from Alexander's Housing Unit to the Operations Unit. (Sweet Aff., ¶ 18). This move may have been related to a contemporaneous request by Johnson to transfer to the night shift. (Def.'s Exh. 9, 8).

---

[8] The basis for Plaintiff's "unwarranted demotion" claim is unclear. Presumably, Johnson is complaining of Whitener's decision to move Johnson out of Transportation and into another unit where there might have been less opportunity to earn overtime pay. Correctional Officers within Transportation had intermittent opportunities to earn overtime when transporting inmates. (Sweet Aff., ¶ 17). Carole Sweet, former Administrative Services Manger at Alexander, avers that during the worst of the economic recession, in the spring and summer of 2009, NCDOC made an agency-wide effort to reduce overtime. (Sweet Aff., ¶¶ 2, 17). There is mention of Johnson's inability to earn overtime as one of the bases for Johnson's grievance against Sgt. Hames. (Def.'s Exh. 2C / Exh. 4A). There is no evidence in the record to support or discredit Plaintiff's assertion that the move was actually a demotion.

In the months following the conflict between Sgt. Hames and Plaintiff Johnson, Johnson and a co-worker, Shana Thompson, had several confrontations in the workplace which triggered a series of internal complaints.  In April 2010, Johnson was "coached" for allegedly making inappropriate comments to Thompson on multiple occasions.  (Def.'s Exh. 12 / Pl.'s 3/4/2010 Statement) (Johnson admits calling Thompson a "bitch").  Plaintiff was advised to review the NCDOC Unlawful Workplace Harassment and Professional Conduct Policy, with an emphasis being placed on "employee conduct standards, staff interaction, and interpersonal skills concerning staff conduct and communication."  (Def.'s Exh. 8 ).  Johnson was told that she was "expected to make the necessary improvement immediately." *Id*. On or around September 27, 2010, Thompson filed a formal complaint with NCDOC alleging that Johnson cursed Thompson in the workplace on multiple occasions.[9]  Thompson filed a second internal complaint against Johnson alleging assault and battery.[10]

The workplace controversy carried over into the state court system.  On September 29, 2010, Thompson filed a Complaint for a No-Contact Order, with the Alexander County District Court, North Carolina General Court of Justice.  The state court issued a Temporary No-Contact Order, which prohibited Plaintiff from having any contact with Thompson, including while at

---

[9] On September 13, 2010, Johnson and Thompson exchanged words at or around the gatehouse to the Alexander facility (the "Gatehouse Incident").  According to Thompson,  Johnson said, "If you have something you need to fuckin' say to me then go ahead and fuckin' say it!"  (Thompson Aff., ¶ 5).  Johnson claims Thompson was taunting and admits making a comment challenging Thompson.  (Pl.'s Statement, 1).

[10] It is undisputed that on September 28, 2010, Johnson and Thompson made physical contact in passing.  According to Thompson,  Plaintiff Johnson intentionally ran into her and "made physical contact with [her] by  means of the left side of her body."  (Thompson Aff., ¶ 4).  Johnson claims Thompson "purposely moved her arm so that she was able to make contact" with Johnson's arm.  (Pl.'s Statement, 4).  According to Johnson, after contact was made, Thompson asked, "Do you mind?" Johnson said "excuse me" as she continued to walk towards her car. *Id*.

work.[11]  (Def.'s Exh. 5B).  In the end, Johnson and Thompson each accused the other of being the instigator or aggressor, and each claimed to have felt threatened by the other such that both women contended that they feared for their safety.[12]  (Def.'s Exhs. 1, 2 1 and  2I, 851).

When Whitener learned of the No-Contact Order, he directed that both Johnson and Thompson be issued "notices" informing them that the matter would be investigated internally, and directing Johnson and Thompson to avoid contact with one another until otherwise instructed.   (Whitener Aff., ¶ 14 and Def.'s Exh. 4C).  Whitener also sought guidance from Region Operations Manager Roger Moon ("Moon").  (Def.'s Exh. 4C / 9-29-10 Email).  At the direction of Moon, Johnson was administratively reassigned from the Alexander County facility to the Catawba County facility effective October 1, 2010.  (Def.'s Exh. 4C).  The memorandum from Whitener to Johnson explaining the reason for her reassignment indicated that "no decision has been reached in this matter" and that her temporary reassignment was in the best interest of all involved "in order to avoid allegations of retaliation or intimidation of any employee who has information related to this investigation." (Def.'s Exh. 4C / 10-1-10 Memo).   The memo expressly stated "This is not a disciplinary action."  *Id.*  In fact, Plaintiff's job title and salary remained the same and Plaintiff was still eligible for shift premium.  (Def.'s Exh. 1, 33, 125–26).

Upon completion of NCDOC's investigation of the Johnson–Thompson incidents, NCDOC determined that Plaintiff exhibited "inappropriate and unprofessional conduct in the

---

[11]  The action initiated by Thompson in response to the "assault and battery" of September 28, 2010 was subsequently voluntarily dismissed.  According to Plaintiff, the fact that Thompson later dismissed the action and elected not to pursue it shows that the suit was commenced solely to harass and retaliate against Johnson.

[12]   These factual disputes are not determinative of the Court's analysis and, therefore, not material.  As discussed, *supra*, the cursing of Thompson on September 13, 2010 that Johnson admitted to provided a legitimate, non-discriminatory basis for termination.

workplace on September 13 and on September 28, 2010."[13]   (Def.'s Exh. 4G, 4).   The investigative findings were routed between various NCDOC personnel.[14]   (Sweet Aff., ¶¶ 12, 13; Whitener Aff., ¶ 17 and Exh. 4D).   On December 10, 2010, Moon, who had been promoted to Region Director for the Western Region, recommended Johnson's termination to his superiors, the Assistant Division Director and Division Director.   (Def.'s Exh. 7A).   In a handwritten note accompanying his recommendation, Moon highlighted the fact that Johnson had admitted to cursing another co-worker and that the problems between the two officers had been ongoing.   *Id.* The Division Director indicated his approval of Moon's recommendation on December 14, 2010. (Def.'s Exh. 7B).   On December 21, 2010,  the Assistant Division Director did the same.   *Id.*

On December 24, 2010, before Johnson was aware of the recommendation to terminate her employment, Johnson filed another formal charge with the EEOC (EEOC file number 430-2011-00756) ("Second EEOC Charge") alleging that her October 1, 2010 reassignment was retaliatory. (Def.'s Exh. 9).   Plaintiff's first allegation of the particulars reads:   "I became employed for the above named employer in October, 2007 as a Correctional Officer.   On December 8, 2009, I filed a complaint with the EEOC charge # 435-2010-00191C.   On October 1, 2010 I was transferred to another Correctional facility."   *Id.*   There is no mention of hostile work environment.   However, in the Intake Questionnaire, Johnson identifies her First EEOC Charge as an additional reason for the current retaliation.   *Id.* at 4, ¶ 4.   The Intake Statement also explains that Johnson "previously filed a charge against [Alexander] for retaliation and

---

[13]   With respect to the September 2010 run-ins with Thompson, Plaintiff conceded to the following policy violations: 1) Cursing Thompson and telling Thompson with respect to the "Gatehouse Incident" that she had a "shitty attitude"; and 2) Passing by Officer Thompson in the facility parking lot close enough for uniforms to have touched.

[14]   Multiple investigative reports were compiled by different NCDOC officials and were routed to Superintendent Whitener and then to Moon for  a recommendation of appropriate action.

[Johnson is] awaiting [her] file be sent to [her] so that [she] may persue[sic] a lawsuit against [Alexander]." *Id.* at 4, ¶6. In other words, Johnson asserted that her reassignment amounted to retaliation for conduct that occurred ten months prior.[15]

On January 3, 2011, Whitener held a pre-disciplinary conference with Johnson, at which time Johnson presented a handwritten statement speaking to the ongoing conflict between her and Thompson. (Whitener, ¶ 18; Def.'s Exh. 7C at 1). The purpose of the pre-disciplinary conference was to provide Johnson with a final opportunity to present evidence in her defense. *Id.*, ¶ 8. Whitener observed that Johnson could not, and did not, refute NCDOC's investigative findings other than to assert that she also felt threatened by Thompson. (Def.'s Exh. 7C). According to Whitener, neither he nor NCDOC ever determined whose version of the September 28, 2010 event (*i.e.*, the alleged "assault and battery") was factually correct. (Whitener Aff., ¶ 19). Rather, Whitener's finding was that Plaintiff Johnson cursed Thompson. *Id.* Pursuant to NCDOC policy, after the conference with Johnson, Whitener reported back to Moon. (Whitener Aff., ¶¶ 8, 18 and Exhs. 4E, 4F).

On January 12, 2011, Moon authored a Memorandum to James French, Deputy Secretary of the NCDOC, recommending Johnson's termination. (Def.'s Exh. 7C). The decision to terminate Johnson's employment was made by Moon, mid-level management, and NCDOC Assistant Secretary James French. (Def.'s Exhs. 7 at ¶ 8; 7C).

Approximately one week after filing her Second EEOC Charge, Johnson was informed by NC that she was to be terminated, effective immediately. In a letter dated February 3, 2011, Defendant cited the following NCDOC Policy:

---

[15] Johnson was issued a right-to-sue letter on her Second EEOC Charge on January 24, 2011. (Pl.'s Exh. 1).

"All employees of the Department of Correction shall maintain personal conduct of an acceptable standard as an employee and member of the community. Violations of this policy may result in disciplinary action including dismissal without prior warning."

(Def.'s Exh. 4G). In addition, the NCDOC Unlawful Workplace Harassment and Professional Conduct Policy was cited:

The Department of Correction is committed to providing a workplace environment that reasonably accommodates all qualified employees and agents of the Department so that they may fulfill their essential job functions and carry out the mission of the Department of Correction in a professional manner and to the best of their ability. All employees and agents of the Department are expected to act in a manner consistent with standards of personal conduct that contributes to a professional work environment in all departmental workplaces. The Department has a ZERO TOLERANCE for violations of the unlawful workplace harassment policy and for retaliation . . . . Every employee and agent of the Department is expected to conduct himself or herself in a professional manner in the workplace. Whenever there is a failure to abide by acceptable personal conduct standards the Department may take action, including disciplinary action, even if the conduct at issue does not rise to the level of illegal discrimination or harassment under state and federal law.

*Id.* Significantly, NCDOC Policy explicitly recognizes that the underlying employee conduct that is deemed unacceptable need not constitute an "unlawful" act of discrimination or harassment. Something less than unlawful (or actionable) discrimination or harassment is grounds for dismissal.

## II.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2010). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same). A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

In conducting its analysis, the Court views the evidence in the light most favorable to the non-moving party. *Celotex Corp.*, 477 U.S. at 325. "The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party." *Pyatt v. Harvest Hope Food Bank*, 2012 WL 1098632, * 2 (D.S.C. February 1, 2012) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms." *Id.* (citing *Reeves*, 530 U.S. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory")). Having reviewed the parties' legal arguments, the evidentiary record, and the applicable law, the Court finds that no genuine disputes of material fact exist and that no jury could reasonably find on this evidentiary record that Johnson was the victim of unlawful retaliation.

### III.

The Court next considers the scope of Plaintiff's Title VII action. Fourth Circuit precedent "make[s] clear that the factual allegations made in formal litigation must correspond to

those set forth in the administrative charge." *Chacko v. Patuxent Institution*, 429 F.3d 505, 509 (4th Cir. 2005) (noting that the administrative framework has a role in focusing the litigation). "If the claims raised under Title VII exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred." *Chacko*, 429 F.3d at 509 (internal quotations omitted) (quoting *Dennis v. County of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995); *see also Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002) (same). "Consequently, "[t]he allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint."" *Id.* (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996)). "At the same time, however, lawyers do not typically complete the administrative charges, and so courts construe them liberally." *Id.* (citing *Alvarado v. Bd. of Trs. of Montgomery Cmty. Coll.*, 848 F.2d 457, 460 (4th Cir. 1988)).

Here, Johnson filed two formal charges with the EEOC. With respect to the First EEOC Charge, Johnson elected not to pursue any legal action after issuance of the right-to-sue letter, reportedly for financial reasons. (Pl.'s Compl., ¶ 7; Def.'s Exh. 1, 26). Johnson concedes that she did not properly exhaust the claims raised within her First EEOC Charge.[16] Thus, absent an exception to Title VII's administrative exhaustion requirement, the claims alleged in the First EEOC Charge may not be raised in this action. *See Chacko*, 429 F.3d at 509 (citing 42 U.S.C. § 2000e-5(b), (f)(1); *Bryant*, 288 F.3d at 132).

On the other hand, Plaintiff's Second EEOC Charge was properly exhausted. Therefore, Plaintiff's Second EEOC Charge steers the Court's Title VII analysis, as well as "any charges

---

[16] Plaintiff's Complaint expressly states that exhaustion was only accomplished as to the Second EEOC Charge. Paragraph 23 of Plaintiff's Complaint reads: "The Plaintiff has exhausted her administrative remedies by filing this EEOC claim 430-2011-00756 within 180 days of her termination and within 90 days of receiving a notice of right to sue letter from the EEOC." (Compl., ¶ 23).

that would naturally have arisen from an investigation thereof." In the Second EEOC Charge, Johnson did not complain of any purported "adverse action" prior to October 1, 2010 even though the charge alleged retaliation by Defendant NC dating back to September 2009. (Def.'s Exh. 9). For this reason, Defendant argues that Plaintiff's Title VII action is limited to her claims of discrimination [retaliation] occurring <u>on or after October 1, 2010</u>. (Def.'s Exh. 9)

Without articulating how such a continuous violation theory might apply to these facts, Johnson's counsel appears to contend that after Johnson reported her concerns about Sgt. Hames to NCDOC in September 2009, she was subjected to a pattern of "continuous retaliatory conduct."[17] With respect to her hostile work environment claim, Johnson similarly alleges that *both* of her EEOC claims served as precipitating events for the challenged conduct.[18]

For purposes of Title VII, "a continuing violation may be found where ... specific and related instances of discrimination *are* permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Poteat v. Mack Trucks, Inc*., 106 F.3d 391, 1997 WL 33117, *4 (4th Cir. 1997) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994) (emphasis in original) (applying former version of Title VII; holding that neither retaliation or hostile work environment allegations could support continuing violation theory). As one secondary authority observed:

> The purpose of permitting a Title VII plaintiff to maintain a cause of action on a continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred. The doctrine is

---

[17] "The Plaintiff argues that it is grossly unfair and extremely strong direct and circumstantial evidence of *continuing retaliation* against the Plaintiff . . . ." (Compl., ¶¶ 8, 18; / Pl.'s Mem. Opp'n, 4) (emphasis added). The Second EEOC Charge does not complain of a "continuing action" and there is no mention of hostile work environment.

[18] "By its actions, as set forth in the paragraphs above, the Defendant State of North Carolina has created a hostile work environment at the Alexander Correctional Institution as to the Plaintiff as a result of the Plaintiff filing EEOC claims 435-2010-00191 and 430-2011-00756." (Compl., ¶ 20).

designed to accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period so that all discriminatory acts committed as part of this pattern or policy can be considered timely. ***However, the continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse***.

45B Am. Jur. 2d Job Discrimination § 1148 (2013) (emphasis added). The Court must consider whether Plaintiff − who admittedly allowed her first Title VII claim to lapse − may now rely on her allegations concerning hostile work environment and retaliatory conduct prior to October 1, 2010.

Johnson's *exhausted* Title VII retaliation claim within the Second EEOC Charge conceivably encompasses pre-October 1, 2010 conduct since the September 2009 sexual harassment complaint is expressly identified as the trigger for the alleged retaliation. As such, discovery of these facts might "naturally have arisen from an investigation" of Plaintiff's Second EEOC Charge. *See e.g., Smith v. First Union Nat'l Bank*, 202 F.3d 234 (4th Cir. 2000) (comparing single EEOC charge to Complaint and finding the two reasonably related where both alleged retaliatory actions by defendant employer's management because of plaintiff's sexual harassment complaints).[19]

Plaintiff's hostile work environment claim, alleged only within Plaintiff's First EEOC Charge (and not exhausted), is not cured by the continuing violation doctrine. Johnson's hostile work environment claim is based primarily on conduct Plaintiff attributes to either Sgt. Hames or Shana Thompson. While Johnson's filings use the term "continuing retaliation," there is no evidentiary basis for the Court to find that the Defendant's alleged conduct amounted to a pattern

---

[19] In *Smith*, the Fourth Circuit panel only had to consider one EEOC Charge and, thus, was not asked to reconcile two different EEOC Charges where one was decidedly not pursued and the claims therein left unexhausted.

of continuous conduct. Rather, the episodes involving Sgt. Hames and Shana Thompson did not go unaddressed and were separate and distinct in both nature and time.

Johnson accused Sgt. Hames of specific instances of sexual harassment. It is undisputed that at least certain of Plaintiff's harassment claims were substantiated by NC and acted upon. To the extent Sgt. Hames' presence at Alexander contributed to a hostile work environment, Hames was administratively reassigned and moved to another facility where he would have no contact with Plaintiff. The complained of behavior was addressed and not allowed to continue. Thus, the record establishes that NC did not accept, condone, or acquiesce in the purported discriminatory behavior, but instead took swift action to correct any inappropriate workplace conduct – including with respect to Sgt. Hames.

As for the Johnson–Thompson conflict, for whatever reason, Johnson and Thompson were simply unable to get along. Even if the conflict between the two was precipitated by an interest in Sgt. Hames or the desire to curry favor with him, the challenged conduct has no meaningful connection or nexus to Johnson's sexual harassment claim. In addition, nearly seven months elapsed between the time that Johnson complained to NCDOC about Sgt. Hames in September 2009 and the first internal complaint related to Thompson was filed against Plaintiff Johnson in April 2010.

The Court now turns to the merits of Johnson's Title VII claims.

## IV.

Title VII prohibits employers from discriminating against an employee with respect to the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e-2(a)(1) (2006). "Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th

Cir.2001); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001). Under Title VII, it is also unlawful for an employer to retaliate against an employee for participating in a Title VII investigation grounded in the employee's opposition to discriminatory workplace practices. 42 U.S.C. § 2000e–3(a).

There are two avenues of proof available to Plaintiff. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d  277, 284 (4th Cir.2004) (en banc) (internal citations omitted). Johnson may provide direct evidence of discrimination, such as "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir.1999) (quoting *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995)). In the absence of direct evidence, Johnson may proceed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

Johnson relies solely on circumstantial evidence and the *McDonnell Douglas* pretext paradigm.[20] Under *McDonnell Douglas,* the plaintiff must first make out a *prima facie* case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Smith*, 202 F.3d at 248 ("The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII.") (internal citations omitted). After the plaintiff establishes a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the termination. *See McDonnell Douglas*,  411 U.S. at 802-03. The employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted). If the

---

[20] Johnson does not produce any direct evidence that any challenged action taken against her, including her termination, was prompted by a discriminatory or retaliatory motive.

employer meets this burden, "the presumption of discrimination created by the *prima facie* case disappears from the case" and the plaintiff must prove that the "proffered justification is pretextual." *McDonnell Douglas*, 411 U.S. at 802-03; *see also Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 255 (1981).

No matter which method of proof is used, plaintiff maintains the burden of persuasion as to the ultimate issue – whether plaintiff can demonstrate, by a preponderance of the evidence, that plaintiff was the victim of retaliation on the part of her employer. *See Diamond v. Bea Maurer, Inc.*, 128 Fed. Appx. 968, 971-72, 2005 WL 943631, * 2 (4th Cir. 2005) (citing *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir.1994)); *Reeves*, 530 U.S. at 142-43 (citing *Burdine*, 450 U.S. at 453.)

According to Johnson, the complaints she submitted to NCDOC and EEOC spurred retaliation by her employer such that the work environment had become hostile towards Plaintiff leading up to her termination. Johnson further contends that her October 1, 2010 reassignment and subsequent termination were retaliatory.

## A. Retaliation / Retaliatory Discharge[21]

To establish a *prima facie* case of unlawful retaliation, Johnson must show: (1) that she engaged in protected activity or opposed a practice made unlawful by Title VII, (2) that the employer took adverse employment action against her, and (3) that there was a causal connection between the protected activity and the adverse action. *See Jones*, 827 F.Supp.2d at 554 (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)).

---

[21] Defendant concedes the propriety of Plaintiff bringing her retaliatory discharge claim in the instant action even though her second EEOC complaint was submitted prior to her February 3, 2011 termination. *See Jones v. Calbert Group, Ltd.*, 551 F.3d 297 (4th Cir. 2009).

Johnson's Second EEOC Charge satisfies the first criteria and her termination constitutes an adverse employment action, the second criteria.[22] The determinative issue as to this claim is whether Johnson's evidence gives rise to a genuine issue of material fact with respect to causal connection, the third element.

Johnson contends that the disciplinary action taken against her was in retaliation for her sexual harassment complaint in September 2009. In Johnson's words:

> Before 9-'10, I had not received any write-ups at AXCI [Alexander], and had no problems with Shana Thompson. Since I wrote and turned in my sexual harrassment[sic] statement on Sgt. Llyod[sic] Hames on 9-19-10, I've received 2 written warnings, had several false statements written on me, been moved off my post more than once, had may[sic] salary reduced, and have been harassed by AXCI [Alexander] staff.

(Pl.'s Statement, 3).

Viewing the evidence in the light most favorable to Plaintiff, the Court holds that no jury could reasonably find that the disciplinary measures taken against Johnson were retaliatory. Johnson's personnel record with NCDOC speaks for itself.

Regarding termination, Defendant represents that Johnson's dismissal was "the result of [her] unacceptable personal conduct." (Def.'s Exh. 4G, 1). In the termination letter, NCDOC cited the two incidents between Plaintiff and Thompson that occurred in September 2010. NC

---

[22] The anti-retaliation provision of Title VII does not limit adverse action to discriminatory actions that affect the terms and conditions of employment. *See* 42 U.S.C. § 2000e-2(a)(1). Rather, the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Sante Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2412–14 (2006).

Regarding the October 1, 2010 reassignment of Plaintiff, the undersigned is not convinced that this action constitutes an adverse action (even under the less-stringest test for determining adverse action under the anti-retaliation provision of Title VII). According to NC, Johnson's reassignment from the Alexander County facility to the Catawba County facility was a necessity: 1) in order to comply with the No-Contact Order issued against Plaintiff Johnson at the request of Thompson; and 2) to provide the NCDOC an opportunity to investigate the claims made by Thompson against Plaintiff.

further stated that Plaintiff's "actions reflect a pattern of similar behavior" given her April 2010 coaching for inappropriate language with a co-worker.

In order to retaliate against Johnson, her employer must have had knowledge of the protected activity. Plaintiff does not produce evidence that the decisionmakers for Defendant were aware of her internal complaints to NCDOC or her two EEOC Charges. Moon was the actual decision maker with respect to Johnson's transfer from Alexander to Catawba.[23] (Def.'s Exh. 4, ¶ 16a; 4C at 933; and Exh. 7, ¶ 3). Likewise, Moon, management at the Division Director level, and the Assistant Secretary collectively made the decision to terminate Plaintiff. (Def.'s Exhs. 7, ¶ 8 and 7C). In fact, Moon was in the midst of seeking approval from his superiors to recommend Johnson's dismissal *before the Second EEOC Charge was filed*. While Whitener may have known that Johnson had lodged internal complaints and filed an initial complaint with the EEOC, there is no evidence that Whitener had knowledge of the Second EEOC Charge.[24] (Whitener Aff., ¶ 4).

Even if Johnson could prove up Defendant's knowledge of the Second EEOC, Johnson was terminated in February 2011 – almost a year and a half after her internal sexual harassment complaint. Accordingly, Plaintiff's temporal proximity argument does not carry the day. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close[.]" *Clark*

---

[23] There is no evidence that Moon (or anybody else) acted as a "cat's paw" for purposes of influencing Whitener's responses to Johnson or to promote any personal agenda regarding Johnson. *See Hill*, 354 F.3d at 290. This is reflected in Whitener's email to Moon, where Whitener says candidly, "Not sure how to proceed as this is a new one." (Def.'s Exh. 4C / 9-29-10 Email).

[24] Plaintiff's Second EEOC Charge was only pending for approximately thirty days. It was filed during the holiday season on December 29, 2010, and dismissed at Plaintiff's request on January 24, 2011. (Def.'s Exh. 9, 7). As a rule, after an EEOC Charge is filed, the EEOC provides notice of the charges to the employer within ten days. 42 U.S.C. § 2000e-5(b).

*County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). If temporal proximity between these two events is missing, it is appropriate to "look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (internal citation omitted) (plaintiff proffered sufficient probative evidence of causation in seven month period between protected activity and termination for purposes of *prima facie* case). "Specifically, evidence of recurring retaliatory animus during the intervening period can be sufficient to satisfy the element of causation." *Id.*

Assuming establishment of a *prima facie* case, Plaintiff presents no evidence to rebut Defendant's legitimate non-discriminatory reason for the disciplinary measures taken. In the Fourth Circuit, in order to survive summary judgment, a successful plaintiff "must have developed some evidence on which a jury could reasonably base a finding that discrimination (or retaliation) motivated the challenged employment action." *See e.g, Smith v. First Union Nat'l Bank*, 202 F.3d 234, 249 ("[A] reason cannot be proved to be a pretext for [retaliation]' unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason.") (internal citations omitted) (emphases in original).

The fact that Plaintiff filed complaints with the EEOC does not protect her from the natural consequences of her actions. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) (protected activity under Title VII "was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work."). In this case, Plaintiff was reported for texting while driving a state vehicle and written up for leaving her post unattended in October 2009. In addition, Plaintiff admitted sending an explicit and suggestive picture to her supervisor, Sgt. Hames – the same Sgt. Hames that Plaintiff accused of sexual harassment.

Johnson's Title VII claim is based in large part upon recourse taken in the Alexander County District Court by Thompson *individually*. According to Johnson, Thompson's purpose in seeking and obtaining a No-Contact Order in state court against Johnson was to retaliate for the internal sexual harassment complaint concerning Sgt. Hames. Johnson claims that higher ranking personnel at Alexander "put Thompson up to" making complaints about Johnson. Thompson denies that she was prompted to act by any NCDOC employee or that her actions were in any way related to Johnson's sexual harassment complaint against Sgt. Hames. (Thompson Aff., ¶¶ 4–7). There is simply *no evidence* that the discord between Johnson and Thompson was encouraged, supported or manufactured by Defendant. Beyond Plaintiff's own self-serving statement, the only evidence Plaintiff offers in support of her retaliation theory is the statement of Former Correctional Officer / Co-Worker Jaedel Adams, who avers that at some unspecified day and time Thompson had spoken about a romantic, physical, or other non-professional interest in Sgt. Hames and that the disagreement between Johnson and Thompson didn't occur until after Johnson filed the complaint about Sgt. Hames. (Adams Aff. at 2).

Here, Plaintiff contends that she and Thompson never had any trouble working together until Johnson filed the sexual harassment complaint against Sgt. Hames. Plaintiff, in fact, received her first written warning within a few months of making her sexual harassment complaint. However, the October 2009 incident, which is well documented, is substantiated by at least three / four other staff members – not Sgt. Hames, Superintendent Whitener, or Shana Thompson. Notwithstanding Johnson's justification of her actions, Johnson admitted to leaving without the express consent of her immediate supervisor or officer in charge. Other than its timing, there is nothing in the record indicating that this disciplinary action has any relation or connection to Johnson's complaint concerning Sgt. Hames. Likewise, a review of the

methodical procedure followed by NCDOC / NCEEO in connection with the Johnson–Thompson matter demonstrates that in order for a jury to believe Johnson's claims, the jury would have to find that the many different officers, lieutenants, assistant superintendents, etc., were acting with some degree of retaliatory animus.

Finally, the cumulative force of Plaintiff's evidence fails to show that Defendant acted with a retaliatory motive. The sum of affidavits produced by Johnson from various co-workers are not probative of the issues presented. The co-worker affidavits from Alexander establish Plaintiff's general competence as a Correctional Officer, that Plaintiff was "courteous," "maintained a neat appearance in uniform," and had "a good attitude with regard to the performance of her duties." (Carson Aff. at 2; Adams Aff. at 1; Farthing Aff. at 1–2). This evidence is consistent with Plaintiff's overall "good" performance rating prior to the late 2009–2010 time period. In each instance, the affiant avers (in nearly verbatim syntax) that he (or she) did not witness Johnson violate workplace policies. (Carson Aff. at 1; Bohler Aff. at 1–2; Adams Aff. at 1) ("I never witnessed any violation of work rules that were in place by Officer Johnson while we were working together at ACI [Alexander].").

Most importantly, there is no legal basis to impute the conflict between Johnson and Thompson to NC. Johnson asserts that Thompson acted on behalf of her employer, the State of North Carolina. Although the conflict played out in the workplace, Thompson was never in a supervisory role or acting with any apparent authority such that her conduct could be confused with "employer action." The two persons were equals in rank and position within Alexander's

Transportation Unit. As tensions grew between them, on September 28, 2009, Thompson pursued civil remedies in the Alexander County District Court.[25]

Given Johnson's conduct in the workplace, and her concessions concerning the same, Plaintiff fails to create a genuine issue of material fact with respect to alleged retaliation or retaliatory discharge by Defendant.

## B. Hostile Work Environment

To the extent Plaintiff's hostile work environment claim based upon retaliation could be viewed as a "continuing violation," Plaintiff's claim still fails as a matter of law in that Johnson offers no evidence that Thompson was acting on behalf of the common employer. Even when viewed in the light most favorable to Plaintiff, the evidence lacks substance with the effect that no jury could reasonably find that Johnson was subject to a hostile work environment as a result of retaliation by NCDOC.

A hostile work environment claim asserts that the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). Courts determine "whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically

---

[25] The first state court action was initiated by Thompson in Alexander County based upon the September 28, 2010 "assault and battery." As noted, this action was voluntarily dismissed by Thompson at the second hearing after Johnson appeared with counsel. Thompson states she simply wanted to put it behind her.

The second action commenced in state court was brought by Johnson on November 30, 2010 in Catawba County District Court for abuse of process and / or malicious prosecution alleging that Thompson wrongfully brought the previous action in Alexander County. (*See Katheryn Renee Johnson vs. Shana Marie Thompson*, 10 CVD 4077). Johnson was successful in this matter and an arbitration award was entered against Thompson on March 19, 2011 in the amount of $1,415.19. Thompson has since paid the judgment in full.

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris*, 510 U.S. at 23). "[S]imple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citations and internal quotation marks omitted). Rather, hostile work environments generally result only after an accumulation of discrete instances of harassment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the cumulative effect of individual acts"); *Spriggs*, 242 F.3d at 184.

To survive summary judgment on this issue, Johnson must demonstrate that a reasonable jury could find the complained of harassment (1) unwelcome; (2) with a discriminatory or retaliatory purpose; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability. *See Spriggs*, 242 F.3d at 183-84 (internal citations and quotation marks omitted).

In order to successfully prosecute a Title VII hostile work environment claim, Plaintiff Johnson first has to produce sufficient evidence from which a jury could reasonably find that the unwelcome conduct was motivated by a retaliatory motive. As previously discussed, Plaintiff is unable to support her claim that the disciplinary measures she attributes to Defendant's desire to retaliate against her were, in fact, retaliatory.[26]

---

[26] In addition, Plaintiff's claim that Whitener's being named and identified *as a potential witness* by Thompson in the related state court litigation is probative of an improper relationship, or an effort to otherwise collude against Plaintiff, is not supported by evidence.

In this case, Plaintiff's hostile work environment claim turns on the absence of evidence establishing a basis for imposing liability against the Defendant. The Supreme Court has held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 118 S.Ct. 2275, 2292–93; *Burlington Indus., Inc. v. Ellerth*, 118 S.Ct. 2257, 2270 (1998). The Second EEOC Charge does not encompass hostile work environment based upon the substantiated claims of sexual harassment by Sgt. Hames and there is no basis to so find based upon a continuing violation theory. Shana Thompson was never a supervisor of Plaintiff's. Therefore, NC cannot be deemed vicariously liable for Thompson's alleged hostile actions. For all of these reasons, the Court finds, as a matter of law, that there is no basis for imposing liability against NC.

Therefore, summary judgment is <u>granted</u> in favor of the Defendant on Plaintiff's Title VII claim.

## V.

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**. Accordingly, Plaintiff's remaining Title VII claim is **DISMISSED**.

Signed: October 16, 2013

Richard L. Voorhees
United States District Judge